UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

JOSHUA M. SARCO,       )
    Plaintiff,       )
                     )    Civil Action No.:  5:19-cv-00086
v.                   )
                     )    By:   Michael F. Urbanski
5 STAR FINANCIAL, LLC,       )    Chief United States District Judge
(d/b/a "ARMED FORCES       )
BENEFIT ASSOC.)       )
    Defendant.       )

## MEMORANDUM OPINION

This matter comes before the court on a motion for summary judgment by the defendant, 5 Star Financial, LLC (d/b/a "Armed Forces Benefit Assoc.) ("AFBA"). ECF No. 55. Defendant submitted an accompanying memorandum in support of its motion. ECF No. 56. All parties agreed to submission of the motion without a hearing. ECF No. 70. The motion has been fully briefed and is ripe for disposition. This motion for summary judgment concerns the two remaining counts—Count 1: Gender Stereotype Nonconformity Discrimination under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. ("Title VII") and Count 2: Sexual Orientation Discrimination under Title VII. Count 3: Hostile Work Environment under Title VII was dismissed with prejudice after the court granted in part the defendant's motion to dismiss. See ECF No. 34. For the reasons discussed below, the court **GRANTS** AFBA's motion for summary judgment on both counts.

## I.    BACKGROUND

On or about August 17, 2015, Joshua Sarco ("Sarco"), Plaintiff, was hired as a customer service representative (CSR) by AFBA, a Virginia life insurance company that primarily

services military families. Am. Compl., ECF No. 17 at 2. When he was hired, he signed the EEO-1 Data Form, which promised that AFBA was an equal opportunity employer and did not discriminate on the basis of race, color, religion, gender, age, national origin, disability, sexual orientation, or any other classification protected by law. Id.; EEO-1 Data Form Exhibit, ECF No. 17-1. Sarco claims everyone in the office knew he was gay because he was open about his sexual orientation and had "effeminate mannerisms and clothing, long hair, flamboyant apparel, and a high-pitched voice which resulted in some clients presuming he was female on the phone." Am. Compl., ECF No. 17 at 3.

The typical duties of a customer service representative included interacting with military members and their families by phone to answer questions about AFBA benefits and services. Id. at 3. Sarco also had sole responsibility for verification and correction of scanned customer benefits applications, whereas other customer service representatives had sole responsibility for other discrete tasks, including claims and underwriting responsibilities. Id.; Memo. in Supp. of Mot. for Summ. J., ECF No. 56 at 4. The job description of a CSR indicates the role included "handling 'incoming calls from customers and market partners accurately and courteously,' 'returning calls from messages promptly,' [and] 'performing duties generated by phone calls—update all record information, make follow up calls, generate correspondence, process terminations and changes[.]'" Id. at 4, ¶ 8 (citing Ex. 1, 4).

Sarco's first performance evaluation on December 29, 2015, indicated that he was performing very well—he was described as "excellent," "knowledgeable," "proactive," and an employee who "accomplishes an outstanding volume of work," and "strives to accomplish tasks thoroughly and accurately." Am. Compl., ECF No. 17-1 at 3. However, over time, his

2

performance declined. Decl. of Amy Wenger, ECF No. 56-1 at 3, ¶ 9.

During 2017, after Sarco's supervisors, Tad Shuey ("Shuey") and Amy Wenger ("Wenger"), started to receive customer and coworker complaints, they became aware that Sarco was not performing his job satisfactorily. Memo. in Supp. of Mot. for Summ. J., ECF No. 56 at 4. According to Shuey and Wenger, Sarco was not completing verifications efficiently, instead waiting until late in the month to complete them. Id. at 10. He made mistakes, ignored his other job duties, and thus created more work for his coworkers. Id. He also often made mistakes when confirming the accuracy and completements of allotments, which are authorizations signed by National Guard members for paycheck withholding of premiums. Id. (citing Ex. A ¶¶ 4, 11). When Ashley Geary ("Geary"), one of Sarco's other supervisors, noticed Sarco was struggling, she tried to help him get organized by placing calendars near the scanner and his desk showing the monthly verifications deadline and by asking him to complete some verifications each day instead of waiting until the end of the month. Id. at 11 (citing Ex. E ¶ 8, Ex. N ¶ 10).

Sarco also took many smoke breaks a day, five to six on average, that each lasted about 10 to 15 minutes. Id. at ¶ 37. During these breaks, he was leaving his coworkers to take his share of customer calls. Id. Coworkers also complained that he was regularly vaping in the bathroom and in his office, even though vaping in the office was not permitted. Id. at ¶ 38. He performed less work than his coworkers, noting 665 phone contacts from July 1, 2018, to January 25, 2019, while Ms. Stinedurf and Ms. Jackson handled about 2,086 and 2,795 calls during that period, respectively. Id. at 12, ¶ 39.

Additionally, Sarco had been seen on YouTube during work multiple times. See id. at

12–14. On some occasions he was uploading videos, while on others he was watching videos. Id. Sarco claims that he was mostly just listening to music. Req. for Admis., ECF No. 64-1 at 28, ¶ 13. AFBA asked Sarco not to use YouTube and the internet so often, specifically mentioning this during Sarco's final November 2018 counseling session, but he did not improve his behavior.  Memo. in Supp. of Mot. for Summ. J., ECF No. 56 at 12, 13.

AFBA had multiple meetings with Sarco throughout 2017 and 2018 in an effort to have him improve his performance. Id. at 14, ¶ 46. In early June 2017, Shuey and Wenger met with Sarco to discuss his failure to respond to customer calls. Id. On July 18, 2017, they held an official counseling session with Sarco, and Wenger told Sarco that customers were continuing to complain that he was not returning their voicemails. Id. Phone records from the second half of June 2017 showed that Sarco had received 26 voicemails and returned only three calls. Id. Shuey and Wenger emphasized that continued failure to respond to customer calls was unacceptable, and Wenger noted that when she pulled Sarco's call information from Vonage, she saw that he had "not been doing this part of [his] job for a long time." Id. Sarco responded by stating that he hoped to "impress [Shuey and Wenger] and fix those issues," and said he "fully [understood] that [his] job depends on it." Id. ¶ 47 (citing Ex. G at 111:18–20, Ex. Q). He also admitted that he "probably could have done better…" and that he needed to improve. Id. (citing Ex. G at 78:12, 112:21–113:15).

In January 2018, Wenger had to talk to Sarco again after three coworkers complained he was again vaping in the bathroom. Id. at ¶ 48 (citing Ex. R). He responded to this disciplinary meeting by saying that he "fully recognize[d] the severity of [his] actions" and wanted "to prove [his] devotion to [his] company and co-workers by going above and

beyond…to make this right." Id. However, he seemed to consider Wenger's directions to be more of a request than an order. Id. (citing Ex. G at 75:22–76:4).

Sarco continued to have problems with his job performance. In February 2018, another employee, Lisa Turner, had to ask him twice to return a customer call, and in March 2018, Turner attempted to transfer a call to Sarco, but when she did, he transferred it to a different employee, Autumn Bird, without explanation. Id. at ¶ 49. Customers also continued to complain. Id. (citing Ex. Y). In October 2018, Geary emailed Shuey and Wenger to inform them that Sarco continued to fail to return customer calls, create necessary forms, and follow through on customer requests. Id. at ¶ 51 (citing Ex. S). Sarco also continued to use YouTube at work, continued taking excessive smoke breaks, and was found deeply asleep at his desk on one occasion. Id. (citing Ex. BB, Ex. S).

On October 31, 2018, Wenger met with Sarco again to discuss his work performance. Id. at 16, ¶ 52 (citing Ex. CC). On November 26, 2018, Shuey met with Sarco again and told him his job was in danger. Id. (citing Ex. DD). In the report from this meeting, Shuey clearly outlined Sarco's work performance problems—taking too many smoke breaks, having an average of 58.6% missed calls, only accessing 215 accounts and documenting 22 calls over a 21-day period, causing customers to submit complaints about him when he didn't send them requested forms, not processing forms, not properly checking allotments and applications, sleeping at his desk during work hours, being on YouTube during work hours on multiple occasions, and pushing verifications to the end of the month instead of working on them steadily. Id. Shuey then explicitly stated, "[f]ailure to improve will result in your termination Friday, January 11, 2019." Id. In response, Sarco wrote that he "refuse[d] to defend anything

listed," that he would allow his "post-November 26th performance and behavior speak for itself," and that he "whole-heartedly plan[ned] on making this the best write-up that's ever happened to [him]." Id.

Yet, eight days after this meeting, Geary saw Sarco on YouTube again. Id. at ¶ 58 (citing Ex. E ¶ 15, Ex. EE, Ex. U, Ex. G, Ex. V). Again, on December 4, 2018, she saw Sarco watching YouTube at 11:15AM and 12:24PM, and then another time on January 7, 2019. Id. at ¶ 59 (citing Ex. BB). So, Shuey had the IT department run a report on Sarco's internet usage for December 2018, which showed that most of the sites accessed by Sarco at work contained video-related content and that on December 14, 2018, he was surfing the internet for personal reasons the entire morning. Id. at ¶ 60 (citing Ex. B ¶ 22–23, Ex. TT). Also in December, Sarco waited until the end of the month to address verifications, not starting until December 20, 2018. Id. at ¶ 61 (citing Ex. FF).

On the other hand, Sarco alleges that Shuey and Wenger had "religious beliefs against and preconceptions concerning homosexuality," which motivated them to denigrate him for his sexuality and gender nonconformance. Am. Compl., ECF No. 17 at 3. For example, he states that Shuey told Sarco that he (Sarco) did not care about their military members and families, which Sarco believes came from Shuey's negative assumptions about gay people. Id. at 3–4. Sarco claims that when AFBA was hiring, his boyfriend submitted an application, but was denied an interview because of his sexuality even though he had the necessary qualifications. Id. at 4. Sarco details an instance where Shuey said AFBA employees chose Chick-fil-A for an office meeting because they believed in "what the company stands for," which Sarco interpreted as referring to Chick-fil-A's anti-LGBTQ+ stance. Id.

Additionally, Sarco avers that Wenger disapproved of his sister-in-law's relationship with his brother, Daniel Sarco, because Daniel was not a Christian, and Wenger's disapproval led his sister-in-law to quit working for AFBA. Id. Sarco also alleges that policies were applied unequally to him, such as when he was told to close his window despite other employees having theirs open, they required his customer service forms to be monitored and double-checked even though he had worked at AFBA for years, they singled him out by explicitly prohibiting articles of clothing that only he wore when they were expecting an AFBA executive visit to the office, they left him alone to answer customer calls for long periods of time, they tried to discourage Sarco and Daniel from taking more than the standard two days of bereavement after their father died, they demanded that Sarco and Daniel not receive personal mail at the office despite other employees being able to, Shuey was hesitant to use the bathroom if he knew Sarco was inside it, and they denied Sarco's application to work from home one evening without reason. Id. at 4–5.

Sarco describes his December 2018 warning from Shuey as "unexpected," and explains that he promised to improve. Id. at 5. He claims he was scheduled for a development counseling session sometime in December 2018 or January 2019, but Shuey cancelled and never rescheduled. Id. Sarco maintains that he improved substantially, and that Robert Custer, the IT Director at AFBA, told him he was ranked highest in total volume of customer calls directed to his extension and second highest in calls answered.[1] Id. Yet, Sarco claims that Shuey told him in January 2019 that his performance "was not even close to being good enough," and shortly thereafter, on January 17, 2019, he received a letter from Human

---

[1] Custer denies telling this to Sarco. Ex. GG ¶ 5.

Resources terminating his employment. Id.; Memo. in Supp. of Mot. for Summ. J., ECF No. 56 at 18, ¶ 62. During the termination meeting, Shuey discussed with Sarco his failure to perform his job duties adequately and reminded Sarco that AFBA had reminded him about internet abuse during work, but that Sarco continued to use the internet excessively. Id. at 18–19, ¶ 62. After Sarco was terminated, Autumn Bird discovered that half of Sarco's contents in his "shred box" were member requests that were not processed even though they should have been. Id. at 19, ¶ 63 (citing Ex. N ¶ 12).

Sarco alleges in Count One of his Amended Complaint that he was discriminated against on the basis of gender stereotypes in violation of Title VII and alleges in Count Two that he was discriminated against on the basis of his sexual orientation in violation of Title VII. Am. Compl., ECF No. 17 at 2.

## II.     LEGAL STANDARD

Under Rule 56(a), the court must "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Glynn v. EDO Corp., 710 F.3d 209, 213 (4th Cir. 2013). When making this determination, the court should consider "the pleadings, depositions, answers to interrogatories, and admissions on file, together with . . . [any] affidavits" filed by the parties. Celotex, 477 U.S. at 322. Whether a fact is material depends on the relevant substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." Id. (citation omitted). The

moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. Celotex, 477 U.S. at 323. If that burden has been met, the non-moving party must then come forward and establish the specific material facts in dispute to survive summary judgment. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986).

In determining whether a genuine issue of material fact exists, the court views the facts and draws all reasonable inferences in the light most favorable to the non-moving party. Glynn, 710 F.3d at 213 (citing Bonds v. Leavitt, 629 F.3d 369, 380 (4th Cir. 2011)). Indeed, "[i]t is an 'axiom that in ruling on a motion for summary judgment, the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.'" McAirlaids, Inc. v. Kimberly–Clark Corp., 756 F.3d 307, 310 (4th Cir. 2014) (internal citation omitted) (citing Tolan v. Cotton, 134 S. Ct. 1861, 1863 (2014) (per curiam)). Moreover, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." Anderson, 477 U.S. at 255.

The non-moving party must, however, "set forth specific facts that go beyond the 'mere existence of a scintilla of evidence.'" Glynn, 710 F.3d at 213 (quoting Anderson, 477 U.S. at 252). The non-moving party must show that "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." Res. Bankshares Corp. v. St. Paul Mercury Ins. Co., 407 F.3d 631, 635 (4th Cir. 2005) (quoting Anderson, 477 U.S. at 249). "In other words, to grant summary judgment the [c]ourt must determine that no reasonable jury could find for the nonmoving party on the evidence before it." Moss v. Parks Corp., 985 F.2d 736, 738 (4th Cir. 1993) (quoting Perini Corp. v. Perini Constr., Inc., 915 F.2d 121, 124 (4th Cir. 1990)). Even when facts are not in dispute, the court cannot grant summary judgment

unless there is "no genuine issue as to the inferences to be drawn from" those facts. World-Wide Rights Ltd. P'ship v. Combe Inc., 955 F.2d 242, 244 (4th Cir. 1992).

## III.   DISCUSSION

Title VII states that an employer may not "fail or refuse to hire or to discharge, or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's...sex." 42 U.S.C. § 2000e-2(a)(1). Title VII prohibits disparate treatment, meaning intentional discrimination, in which "an employer has treated a particular person less favorably than others because of a protected trait." Ricci v. DeStefano, 557 U.S. 557, 577 (2009). The key question in a disparate treatment case is "whether a protected characteristic of the employee motivated action taken by the employer." Barnett v. Tech Int'l Inc., 1 F. Supp. 2d 572, 577 (E.D. Va. 1998) (citing Hazen Paper co. v. Biggins, 507 U.S. 604, 610 (1993)). A plaintiff can use two alternative methods of proof to defeat summary judgment in a Title VII case—(1) the mixed-motive framework, or (2) the McDonnell Douglas framework. Croft v. City of Roanoke, 862 F. Supp. 2d 487, 493 (W.D. Va. 2012).

Under the "mixed motive" framework from Price Waterhouse v. Hopkins, 490 U.S. 228 (1989), courts evaluate whether decisions have been "based on a mixture of legitimate and illegitimate considerations." If an employer considers gender *and* legitimate factors when making a decision, "that decision was 'because of' sex *and* the other, legitimate considerations." Id. at 241 (emphasis added).

Under the McDonnell Douglas framework, to prevail in a claim for Title VII discrimination, (1) a plaintiff must establish a *prima facie* case of discrimination; (2) if the

plaintiff does so, the burden shifts to the defendant to show a legitimate non-discriminatory or non-retaliatory reason for the adverse employment action; and (3) if the defendant does so, the burden shifts back to the plaintiff to prove by a preponderance of the evidence that the reason given is pretextual. See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802–04 (1973); Guessous v. Fairview Prop. Invs., LLC, 828 F.3d 208, 216 (4th Cir. 2016). Without direct evidence, the elements of a *prima facie* Title VII discrimination claim are: "(1) membership in a protected class; (2) satisfactory job performance; (3) adverse employment action; and (4) different treatment from similarly situated employees outside the protected class." Coleman v. Maryland Court of Appeals, 626 F.3d 187, 190 (4th Cir. 2010).

## A. Gender Stereotype Discrimination

An employer is not permitted to "assume or insist" that an employee match the stereotypes associated with their gender. See Price Waterhouse, 490 U.S. at 251. The employee must show that the employer relied on their gender when making its decision, and stereotyped remarks can be evidence that gender played a part, but such remarks are not necessarily conclusive evidence that gender played a role in an employment decision. Id. The question of whether an employer relied on gender stereotypes can be answered by asking if the plaintiff would have been criticized as sharply or at all if they were another gender. Id. at 258. It can also be answered by asking if the behavior or trait at issue would have been viewed more or less favorably if the employee were of a different gender. See Zarda v. Altitude Express, Inc., 883 F.3d 100, 120 (2nd Cir. 2018).

Plaintiff contends that he has established sufficient evidence of gender stereotype

discrimination under both the mixed-motive framework and the <u>McDonnell Douglas</u> framework. Opp. to Mot. for Summ. J., ECF No. 64 at 6. The court will address each method of proof in turn.

1. Mixed-Motive Framework

Under the mixed-motive framework, an employee must provide "sufficient direct or circumstantial evidence for a reasonable jury to find that a protected trait 'actually motivated'" the decision to take adverse employment action. <u>Croft</u>, 862 F. Supp. 2d at 494 (citing <u>Reeves v. Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133, 153 (2000)). It is not required that an employee show that the protected trait was the "sole motivating factor," but they must show that it "actually played a role in the employer's decisionmaking process and had a determinative influence on the outcome." <u>Id.</u>

In <u>Croft</u>, the court concluded that Croft had not provided sufficient evidence that his discipline was motivated by gender bias. <u>Croft</u>, 862 F. Supp. 2d at 294. Croft claimed that statements made by the disciplining chief, including that the chief noted that Van Ness was "more comfortable" sharing intimate information about her relationship with Croft with "another female" employee, was direct evidence of discriminatory animus based on gender. <u>Id.</u> The court did not agree, finding that "[a] statement that simply references gender or some other protected trait, but fails to express any bias against an employee because of that trait, is insufficient to constitute direct evidence of discrimination." <u>Id.</u> (citing <u>Price Waterhouse</u>, 490 U.S. at 277). The court found that this was a "benign reference to gender" and did not create an inference that gender bias "actually motivated" the disciplinary action against Croft. <u>Id.</u> (internal citations omitted).

Here, Sarco argues that his supervisors, Shuey and Wenger, discriminated against him on the basis of his gender nonconformity. Plaintiff described himself as possessing "effeminate mannerisms." Am. Compl. at 3, ¶ 16. Sarco said that when AFBA executives would visit the Staunton office, Shuey and Wenger would remind the employees to "dress up," but explicitly said "and no bandanas." Id. Sarco said he was the only person in the office who wore colorful bandanas and he saw this as Shuey and Wenger "singling [him] out." Id. He also detailed an instance where a customer mistook his voice for a woman's voice on the phone and flirted with him, and when he shared this with Autumn Bird, she told Shuey and Wenger, and others overhead, "causing a huge laugh." Id. at 12. Sarco expressed that he felt he was being ridiculed. Id.

Unlike in Croft, the statements and conduct at issue here do not even reference gender or gender stereotypes, let alone express bias against Sarco because of that trait. See Croft, 862 F. Supp. 2d at 494. As such, these statements are insufficient direct evidence of discrimination. See id. These statements and this conduct are also insufficient circumstantial evidence of discrimination because without any reference to gender, or nexus between the statements and conduct and the termination decision, they are "insufficient to establish that gender, or any other protected trait, actually played a role...and had a determinative influence on the outcome." Id. at 496. Therefore, Sarco has not shown gender stereotype discrimination under the mixed-motive framework.

2. McDonnell Douglas Framework:

To survive summary judgment under the McDonnell Douglas framework, Plaintiff must first show a *prima facie* case of gender stereotype discrimination. See McDonnell Douglas

Corp. v. Green, 411 U.S. at 802–04. Defendant argues that Plaintiff has not established a *prima facie* case of discrimination based on gender nonconformity. Memo. in Supp. of Mot. for Summ. J., ECF No. 56 at 34.

Defendant concedes that Plaintiff is a member of a protected class. Id. at 22. However, Sarco has not shown satisfactory job performance. A plaintiff can submit three types of evidence to show that they were meeting their employer's expectations:

> (1) employer concessions that the employee was performing satisfactorily at the time of the discharge, (2) evidence that the employer had previously given the employee positive performance reviews [,] or (3) qualified expert testimony as to the employer's legitimate job performance expectations and an analysis and evaluation of plaintiff's performance in light of those expectations.

David v. Winchester Med. Ctr., W.D. Va. No. 5:16-CV-00063, 2018 WL 310140, *14 (W.D. Va. Jan. 5, 2018), aff'd, 759 Fed. Appx. 166, 2019 WL 168922 (4th Cir. 2019) (citing Jones v. Calvert Grp., Ltd., Civ. No. DKC 06-2892, 2010 WL 5055790, at *6 (D. Md. Dec. 3, 2010) (internal citation omitted). Further, the perception of the decisionmaker is what is relevant to evaluating job performance. Smith v. Flax, 618 F.2d 1062, 1067 (4th Cir. 1980); Johnson v. Mechanics & Farmers Bank, 309 F. App'x 675, 683 n.8 (4th Cir. 2009).

Here, there were no employer concessions that the employee was performing satisfactorily at the time of termination. Rather, Wenger and Shuey were clearly dissatisfied with Sarco's job performance even after they made numerous attempts to encourage him to improve. They first discussed his performance issues with him in 2017, but the issues continued into 2018. Memo. in Supp. of Mot. for Summ. J., ECF No. 56 at 23 (citing Ex. Z).

They noted "that Sarco failed to (1) return customer calls; (2) to follow through on customer requests, and (3) to complete verifications in a timely fashion." Id. Between August and November 2018, Sarco was taking "excessive breaks," was found asleep at his desk, and "regularly accessed YouTube during working hours." Id. He also had problems with "allotments, batch printing, and age-ups." Id. Furthermore, Sarco vaped in the office in violation of company policy. Id. Despite multiple counseling sessions with Shuey and Wenger, Sarco did not significantly improve his performance. Id. at 24. His final counseling session was in November 2018, wherein Shuey again outlined Sarco's performance issues. Id. He explicitly told Sarco that "failure to improve will result in [his] termination on Friday, January 11, 2019." Id.

Sarco has only presented evidence of one past positive performance review. It is a review from December 2015 that described Sarco as "excellent," "knowledgeable," "proactive," and an employee who "accomplishes an outstanding volume of work," and "strives to accomplish tasks thoroughly and accurately." Am. Compl., ECF No. 17-1 at 3. However, 2015 was the beginning of Sarco's employment, and at the end of his employment, he was not performing well. See supra at 5–6. Recent, negative reviews of job performance are not outweighed by earlier positive reviews. David, 2018 WL at *14 (internal citation omitted).

Sarco claims that Ronald Custer, Senior Developer for AFBA, provided him with data that showed that "he ranked highest in total volume of customer calls" and "second highest calls answered." See Am. Compl., ECF No. 17 at 6, ¶ 28. But Sarco's volume of customer calls was not the only metric by which he was underperforming. Shuey and Wenger outlined

numerous other examples of where he was not meeting expectations, such as by violating company rules and waiting until the last minute to complete verifications, thus resulting in mistakes. Memo. in Supp. of Mot. for Summ. J., ECF No. 56 at 10. Accordingly, Sarco has not met the required element of showing satisfactory job performance.

Sarco has shown an adverse employment action, namely, being fired. Yet, he has also not shown different treatment from similarly situated employees outside the protected class, the last element of a *prima facie* Title VII discrimination claim. Coleman, 626 F.3d at 190. Defendant argues that he has not even identified a similarly situated comparator. Memo. in Supp. of Mot. for Summ. J., ECF No. 56 at 26. Sarco alleges that "no employee had been terminated for inadequate performance at the Staunton AFBA office for several years before Sarco, if ever," but does not allege that any other employee was performing inadequately. Id. Further, this allegation is untrue because AFBA fired Mandy Heatwole, a heterosexual employee, before Sarco. Id.

Sarco seems to make some attempt to identify Shuey as a comparator, claiming that he also worked on tasks for an outside business while at work, justifying the time Sarco spent uploading videos to his YouTube channel while at work. Opp. to Mot. for Summ. J., ECF No. 64 at 3, ¶ 3. However, Sarco does not explicitly claim that Shuey is the comparator, and even if he did, Shuey is not similarly situated. To determine if a comparator is similarly situated, courts look at "whether the employees (i) held the same job description, (ii) were subject to the same standards, (iii) were subordinate to the same supervisor, and (iv) had comparable experience, education, and other qualifications…" Spencer v. Virginia State Univ., 919 F.3d 199, 207 (4th Cir. 2019), as amended (Mar. 26, 2019). Shuey was Sarco's supervisor, so he was

clearly not similarly situated. Therefore, since Sarco has not shown satisfactory job performance or disparate treatment compared to a similarly situated employee outside of the protected class, he has not successfully alleged a *prima facie* claim of discrimination based on gender nonconformity.

Had Sarco successfully alleged a *prima facie* claim of discrimination, the burden would then shift to his employer to show a legitimate non-discriminatory reason for firing him. See McDonnell Douglas, 411 U.S. at 802–04. AFBA has done so. It has detailed the many ways that Sarco's performance was lacking before he was ultimately terminated. Memo. in Supp. of Mot. for Summ. J., ECF No. 56 at 34. Sarco's supervisors had at least five counseling sessions with him over a two-year period, where they told him their expectations, gave him the opportunity to respond, and gave him multiple chances to improve. Id. Despite their efforts, Sarco's performance did not significantly improve, and AFBA felt it had no choice but to terminate him. See id.

Since AFBA showed a legitimate non-discriminatory reason for firing Sarco, the burden would shift back to Sarco to show that it was mere pretext. See McDonnell Douglas, 411 U.S. at 802–04. AFBA argues that Sarco did not point to any gender-based remarks that were made around the time of his termination, instead pointing to "unrelated situations between 2013 and 2018 to support his claims." Memo. in Supp. of Mot. for Summ. J., ECF No. 56 at 34. AFBA further contends that Shuey and Wenger did not target or single out Sarco based on his gender nonconformity and that the request for employees to "dress up" when executives visited was a gender-neutral request to wear business casual attire. Id. at 7, ¶ 22. The court agrees. None of Sarco's evidence references his gender nonconformity or gender

stereotypes, so a reasonable jury would be unable to conclude that gender stereotype discrimination was a pretext for Sarco's termination.

Sarco has not proven gender stereotype discrimination under either the McDonnell Douglas or mixed-motive frameworks, so AFBA is entitled to summary judgment on Count One.

## B. Sexual Orientation Discrimination

Plaintiff also argues that he has established a case of sexual orientation discrimination under both the mixed-motive and McDonnell Douglas frameworks. Opp. to Mot. for Summ. J., ECF No. 64 at 6. Again, the court will address each framework in turn.

### 1. Mixed-Motive Framework

The same legal framework outlined above under gender stereotype discrimination also applies to Sarco's sexual orientation discrimination claim. See supra at 13. Hence, Sarco must show, using direct or circumstantial evidence, that his homosexuality "actually motivated" AFBA's decision to fire him. See Croft, 862 F. Supp. 2d at 494 (internal citation omitted).

Sarco contends that Shuey and Wenger denigrated and singled him out based on his sexual orientation because of "their religious beliefs against and preconceptions concerning homosexuality." Am. Compl. at 4, ¶ 17. He alleges that Shuey accused him of not caring about United States soldiers and airmen based on negative assumptions about gay people. Id. at ¶ 19. Sarco also alleges that though AFBA announced an open position and requested that "friends" of employees apply, Shuey and Wenger refused to interview Sarco's boyfriend and claimed they didn't receive his application even though an HR employee said any applications received were delivered to Staunton. Id. at ¶ 20. Sarco claims as further evidence of Wenger's

18

religious biases that she told a former employee, Kelly, that she disapproved of Kelly dating Daniel Sarco, Joshua Sarco's brother, because he was not a Christian. Id. at ¶ 21. Sarco also contends he was denied remote-access to work from home for no reason, the rules were applied differently to him and his brother (e.g. asking him to close his window, requiring his customer service forms to be monitored and double-checked, and singling him out for articles of clothing only he wore), that he was left alone to answer phone calls for long periods of time, that AFBA tried to convince him and his brother to take fewer than the two standard days of bereavement, that he and his brother were not allowed to receive personal mail at the office, and that Shuey appeared hesitant to use the bathroom if he knew Sarco was inside. Id. at ¶¶ 22–23. Furthermore, Sarco asserts that Shuey declared that they were serving Chick-fil-A at an office meeting due to "what the company stands for," which Sarco understood to mean the restaurant's support of anti-LGBTQ+ legislation. Am. Compl., ECF No. 17 at 5, ¶ 24. In further support of his contention of sexual orientation discrimination, Sarco cites an instance where Shuey said he was taking some agents out to dinner, and that any of the AFBA employees were welcome to join if they wanted, but then stated, "but only join us if you find eating steak with a bunch of old white guys entertaining." ECF 64-1 at 8. Sarco interpreted this as "no gays allowed." Id. He also explains that for the office Christmas dinner at a country club in 2018, the employees were told that they could bring "spouses." Id. at 9. Sarco interpreted this as meaning that he could not bring his boyfriend. Id.

None of Sarco's evidence is sufficient to constitute direct evidence of discrimination. The Fourth Circuit has defined "direct evidence" of discrimination as "evidence of conduct or statements that both reflect directly the alleged discriminatory attitude and that bear directly

on the contested employment decision." <u>Taylor v. Va. Union Univ.</u>, 193 F. 3d 219, 232 (4th Cir. 1999). This can include evidence that the decisionmaker "announced, or admitted, or otherwise unmistakably indicated that [the protected trait] was a determining factor" in the adverse employment decision. <u>Croft</u>, 862 F. Supp. at 494 (citing <u>Cline v. Roadway Express, Inc.</u>, 689 F. 2d 481, 485 (4th Cir. 1982) (internal citation omitted)).

Likewise, Sarco's evidence is not sufficient to constitute circumstantial evidence of discrimination. While a reasonable juror could agree with Sarco that some of Shuey's and Wenger's comments and beliefs reflect a discriminatory attitude towards gay people, Sarco has not provided any indication that the alleged animus "was a determining factor" in his termination. <u>See id.</u> At no point did Shuey or Wenger explicitly mention Sarco's sexual orientation or provide any indication that it played a role in their decision to fire him. Rather, the evidence is overwhelming that they terminated him due to his poor work performance after numerous attempts to get him to improve. Thus, Sarco has not sufficiently shown sexual orientation discrimination under the mixed-motive framework.

### 2. McDonnell Douglas Framework

As with his gender stereotype discrimination claim, to survive summary judgment on his sexual orientation discrimination claim under the <u>McDonnell Douglas</u> framework, Sarco must first show a *prima facie* case of discrimination. <u>See McDonnell Douglas Corp. v. Green</u>, 411 U.S. at 802–04. Sarco must show membership in a protected class, satisfactory job performance, adverse employment action, and different treatment from similarly situated employees. <u>Coleman</u>, 626 F.3d at 190.

As discussed in relation to Sarco's claim of gender stereotype discrimination, he did

show adverse employment action. See supra at 16. However, Sarco has not satisfied the requirement of showing that his job performance was satisfactory. See supra at 14–16. He also did not identify a similarly situated employee who was not a member of his protected class that was treated more favorably. See supra at 16. As mentioned previously, Mandy Heatwole, a heterosexual employee, was previously fired for poor job performance. See supra at 16–17. Additionally, Shuey was not similarly situated. See supra at 17. Therefore, Sarco did not show a *prima facie* case of sexual orientation discrimination.

As discussed in the prior section, even if Sarco had established *prima facie* discrimination, AFBA has met its burden of showing a legitimate non-discriminatory reason for firing Sarco. See supra at 17. Sarco's work performance was not satisfactory and did not sufficiently improve despite many counseling sessions and discussions. Id.

Since AFBA showed a legitimate non-discriminatory reason for firing Sarco, the burden would shift back to him to show that it was mere pretext for sexual orientation discrimination. See McDonnell Douglas, 411 U.S. at 802–04. Sarco has failed to establish pretext as he has adduced no evidence from which a reasonable jury could conclude that his sexual orientation played any role in AFBA's decision to fire him.

The evidence does not support a finding that AFBA was discriminating against Sarco based on his sexual orientation. In fact, when it hired him, his supervisors were aware that he was gay. Memo. in Supp. of Mot. for Summ. J., ECF No. 56 at 27. When another employee heard a tenant below her office talking badly about Sarco to his customers, making homophobic comments, and saying he did not like going into AFBA's office because he didn't want to interact with Sarco since he is gay, she reported it to Shuey and Wenger. Id. at 9 (citing

Ex. HH ¶¶ 8, 9). Shuey and Wenger were upset by the tenant's comments, so they talked to him and demanded that all of their employees be treated with respect regardless of their sexual orientation. Id. They asked the tenant to stop talking badly about Sarco with his customers. Id.

In light of the evidence, a reasonable juror could not reach a conclusion that sexual orientation discrimination was pretext for Sarco's termination. Accordingly, Sarco has not shown sexual orientation discrimination under the McDonnell Douglas framework. Because Sarco has not shown sexual orientation discrimination under the mixed-motive or McDonnell Douglas frameworks, AFBA is entitled to summary judgment on Count Two.

## IV.   CONCLUSION

For the reasons outlined above, the court concludes that based on the evidence provided, a reasonable jury could not find that Sarco's termination was motivated in whole or in part by his gender nonconformity or sexual orientation. The court hereby **GRANTS** Defendant's motion for summary judgment on both counts. An appropriate Order will be entered.

Entered: 03—24—2022

Michael F. Urbanski
Chief United States District Judge